UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| VITALIY STRIZHEUS, NATALIYA STRIZHEUS,<br><br>           Plaintiffs,<br><br>     vs.<br><br>THE CITY OF SIOUX FALLS, SOUTH DAKOTA,<br><br>           Defendant. | 4:23-CV-04028-RAL<br><br><br>OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION |

Plaintiffs Vitaliy and Nataliya Strizheus (collectively "Plaintiffs") seek a preliminary injunction to prevent Defendant the City of Sioux Falls ("the City") from enforcing a final state court judgment permitting the razing of Plaintiffs' partially constructed mansion because of past violations of the City's code. Razing of the home would be an incredibly wasteful, unfortunate, and somewhat irrational undertaking. However, under the facts and applicable law, Plaintiffs have failed to make a sufficient showing to justify a federal district court entering a preliminary injunction that effectively would overturn state court decisions on matters of state law. Nothing in this decision prevents Plaintiffs from pursuing federal constitutional claims for a Fifth and Fourteenth Amendment taking without just cause or an Eighth and Fourteenth Amendment claim for excessive fine or from seeking relief in state court, if the City proceeds to demolish the structure.

1

## I.   PROCEDURAL AND FACTUAL HISTORY

The City had given notice that it would raze Plaintiffs' partially constructed mansion beginning on February 27, 2023.  Plaintiffs filed this suit on February 17, 2023, ten days before the start of the City's planned demolition, Doc. 1, and then sought a motion for preliminary injunction on February 19, 2023, Doc. 3.  This Court set and held an evidentiary hearing on the motion for preliminary injunction on February 24, 2023, the Friday before the date the City gave for demolition to begin.  At the close of the hearing, the City agreed at this Court's request to wait for a 28-day period both because of the volume of snow on the ground and to allow additional time for the parties to brief and this Court to rule on the preliminary injunction motion.  This Court then entered an order directing that the City take no action to raze Plaintiffs' home for 28 days (until March 27, 2023) and reserving decision on the preliminary injunction motion until then to allow the parties to explore settlement and to submit any further brief on issues framed by the hearing. Doc. 23.

Plaintiffs filed an Amended Complaint on March 3, Doc. 30, dropping both certain city officials as named defendants and their claims under 42 U.S.C. § 1983 for violation of the equal protection clause and civil conspiracy for alleged discrimination against them as Ukrainians.[1]  The City filed a post-hearing supplemental brief and affidavit, Docs. 31–32, and Plaintiffs filed a

---

[1] On March 22, 2023, Plaintiffs filed a motion for leave to file a second amended complaint, Doc. 36, and a proposed Second Amended Complaint seeking to add Mayor Paul TenHaken and John Doe city officials 1 to 100 and restating the claims for violation of the equal protection clause and civil conspiracy alleging discrimination based on their ethnic background, Doc. 36-1.  The proposed Second Amended Complaint also alleges a new Count IV for equitable estoppel.  Doc. 36-1.  Although those claims are missing from the Amended Complaint, this opinion and order will address them.

supplemental brief, Doc. 33.[2]  Though it would be far more rational for the parties to resolve this dispute through perhaps auction or other prompt sale of the house to someone who would quickly finish it, the parties have not settled the dispute.

This Court draws the facts from the testimony and exhibits from the February 24 hearing, the materials of record not being contested, and the decision of the Supreme Court of South Dakota in the underlying litigation.[3]  Plaintiffs Vitaliy and Nataliya Strizheus married in 2004 and have seven children.  Both emigrated from Ukraine to Sioux Falls, Vitaliy arriving when he was 12 and Nataliya arriving when she was 14.  Nataliya is a stay-at-home mother, while Vitaliy has been involved with online marketing of others' products and established The Four Percent Group LLC apparently to sell instructions on how to profit from online marketing.

In 2013, Plaintiffs bought lots at 6800 South Westfield in southern Sioux Falls, intending to build a 10,000 square foot, custom-made dream mansion on the lots.  Plaintiffs were denied the construction loan they sought and instead decided to self-finance construction.  The City issued a building permit on August 12, 2013, to Plaintiffs' initial general contractor, Creative Building Corporation, to start residential construction.  In 2015, a client who represented 90% of Vitaliy's business income went bankrupt, and the following year Vitaliy's father was diagnosed with cancer. Progress on the partially constructed mansion stalled in 2015 due to the inability of Plaintiffs to

---

[2] The City also filed a Motion to Dismiss, Doc. 34, and memorandum in support, Doc. 35, on March 17, 2023.  Under the District of South Dakota's Civil Local Rules, Plaintiffs have 21 days within which to file a response brief, and the City has 14 days thereafter to file its reply.  This decision does not rule on the motion to dismiss although issues presented in that motion overlap considerably with the analysis of likelihood of success on the merits.

[3] The City filed the lower state court's Order and Judgment Granting Plaintiff City of Sioux Falls' Motion for Summary Judgment, Doc. 32-3, but that two-page order contains no discussion of facts from which to draw.

finance further construction.  Apparently, only the shell of the home was completed or partially completed at that point.

The partially completed home was vandalized multiple times by local juveniles according to the Plaintiffs.  On one occasion in or around 2016, a swastika[4] was painted on a concrete wall of the partially completed home, Exh. 5, although there is no evidence that the City in any way endorsed that abomination.  Neighbors complained to the City about the stalled construction and condition of the lot.  A city attorney testified at the preliminary injunction hearing that he accompanied a city inspector to the site and found it unsecured with pigeons living inside; the city attorney considered the home to be a nuisance.

On August 31, 2016, the City found the house to be an unsafe structure as defined by Section 108.1.1 of the International Property Maintenance Code (IPMC) and unfit for human occupancy as defined by Section 108.1.3 of the IPMC.[5]  City of Sioux Falls v. Strizheus, 984 N.W.2d 119, 121 (S.D. 2022).  The City had adopted the IPMC through Sioux Falls City Ordinance (SFCO) 150.095, subject to certain amendments, additions and deletions as set forth in SFCO 150.096.  Id. at 121–22.  That code provision states:

> The code official shall order the owner or owner's authorized agent of any premises upon which is located any structure, which in the code official's or owner's authorized agent judgment after review is so deteriorated or dilapidated or has become so out of repair as to be dangerous, unsafe, insanitary, or otherwise unfit for human habitation or occupancy, and such that it is unreasonable to repair the

---

[4] If the swastika was meant as a commentary on Plaintiffs' Ukrainian heritage, the painter was doubly ignorant in that Ukraine at the time of Nazi Germany was part of the Soviet Union and an ally of the United States during World War II that suffered enormous casualties when Germany invaded eastward.

[5] A review of the most recent iteration of the IPMC shows that the sections cited in the Supreme Court of South Dakota have been moved.  2021 International Property Maintenance Code, ICC Digital Codes, https://codes.iccsafe.org/content/IPMC2021P1/preface (Relocations).  In the 2021 IPMC, the section regarding "Unsafe Structures and Equipment" are now in Section 111, rather than section 108 as they were in the 2018 version adopted by the City.  However, the substance of these sections remains unchanged.

structure, to demolish and remove such structure; or if such structure is capable of being made safe by repairs, to repair and make safe and sanitary, or to board up and hold for future repair or to demolish and remove at the owner's option; or where there has been a cessation of normal construction of any structure for a period of more than 18 months, the code official shall order the owner or owner's authorized agent to demolish and remove such structure.

Id.; SFCO § 150.096.

The City on September 2, 2016, issued a notice of demolition ordering the Plaintiffs to begin demolition of the home within 20 days of receipt of the notice. City of Sioux Falls, 984 N.W.2d at 121; Doc. 32-1. Plaintiffs appealed the order for demolition to the Property Maintenance Board of Appeals, which granted them an extension until December 1, 2016, to complete the exterior of the home. City of Sioux Falls, 984 N.W.2d at 122. Plaintiffs failed to complete the home exterior by that date. Id.

On September 22, 2017, the City issued an amended notice and order for demolition to the Plaintiffs, finding the structure to remain in violation of the City's ordinance, and requiring completion of demolition by November 11, 2017. Id.; Doc. 32-2. Plaintiffs neither appealed this order nor demolished the partially completed house. City of Sioux Falls, 984 N.W.2d at 122. The City then filed a complaint in state court in December of 2018, seeking enforcement of its ordinance and the order for demolition thereunder. Id. The City alleged that it had issued at least seven building permits since the initial permit in 2013 and that each had been suspended or cancelled due to a lack of progress or inspection. Id. Plaintiffs took out additional permits but did not initially hire an attorney, and the City sought default judgment. Id. Plaintiffs then hired an attorney, contested default judgment, and represented that they expected to complete the exterior of the home by October 1, 2019. Id. The case then languished.

More than two years later, the City filed a motion for summary judgment and statement of undisputed materials facts, with several affidavits including nearly identical affidavits from three

neighbors, the chief building official's affidavit, and an affidavit from Plaintiff's contractor Troy Stallings of Creative Building Corporation. Id. at 122–23. The City's submissions established that Plaintiffs had not made any significant progress since 2015 toward completion of the home and indeed the general contractor no longer had an agreement in place with Plaintiffs, had canceled the insurance, and had done no work since 2015. Id.

Plaintiffs at this point in the state litigation were proceeding again without an attorney, did not file a response to the statement of undisputed material facts, and countered with unsworn statements about intending to complete the home and having arrangements to do so. Id. at 123. Plaintiffs made none of the claims raised in their Complaint, Amended Complaint, or proposed Second Amended Complaint—that the demolition would be a takings clause violation under the Fifth and Fourteenth Amendments and an Excessive Fine under the Eighth and Fourteenth Amendments, that the City and its officials were acting with ethnic animus and engaged in a civil conspiracy to deprive Plaintiffs of their constitutional rights, that the ordinance was unconstitutional, or that the City is estopped to enforce demolition orders by having granted permits during the pendency of the state case. The state judge granted summary judgment, concluding that the City had shown that normal construction had ceased for over eighteen months. Id.

Plaintiffs hired counsel and appealed, arguing that the City failed to meet its burden of showing an absence of "normal construction . . . for a period of more than 18 months" under the language of the ordinance. See SFCO § 150.096. On December 28, 2022, the Supreme Court of South Dakota affirmed the grant of summary judgment, noting that Plaintiffs had failed to submit any reliable information that would point to a genuine issue of material fact on violation of the ordinance. See generally Strizheus, 984 N.W.2d 119. The City thereafter gave Plaintiffs notice

of an intention to demolish the home beginning on February 27, 2023.  Doc. 3 ¶ 1.  This lawsuit and request for preliminary injunction then followed.

The condition of the partially constructed home changed considerably during the pendency of the appeal to the Supreme Court.  Plaintiffs had obtained multiple permits from the City for further construction of the home before entry of summary judgment.  Plaintiffs hired Ben Harvey Custom Homes, Inc. ("Harvey Custom Homes") as a new general contractor on December 1, 2021, and Harvey Custom Homes obtained five permits during December of 2021.  Exh. 6.  Plaintiffs paid Harvey Custom Homes over two million dollars to put on a new roof, complete the exterior except for some finish work on the deck, do framing, mechanical work, HVAC, plumbing, fireplaces, interior sheetrock work, and driveway and landscaping work.  The City conducted a series of inspections of the work during the pendency of the appeal and issued two additional permits for sprinkler system and sidewalk work while the case was on appeal.  Doc. 4; Exh. 6. Those inspections included approval of the mechanical survey in December 2021 and mechanical rough-in around May 25, 2022; plumbing survey in January 2022 and plumbing rough-in around March 2022; mechanical fireplace in September 2022; and lawn sprinkler in November 2022.  Exh. 6.  The work of Harvey Custom Homes has passed City inspections to this point.  Harvey Custom Homes was aware of the summary judgment order to raze the home but was instructed by Vitaliy to continue with the work.  Recent pictures of the home show the exterior to be nearly completed with finish work on a deck remaining and the interior to be sheet rocked but with all finish work remaining.  Exhs. 2–3, 10.

Plaintiffs had a realtor view the home in early 2023 to opine as to the fair market value of the home in its current state of construction.  The realtor believes that the present market value of

the home is $2.75 million. Doc. 5. Vitaliy testified that the lots on which the home sits have a value of as much as $800,000.

Plaintiffs believe that they have been discriminated against as immigrants of Ukrainian ancestry and make such a claim as a part of Counts II and III of the initial Complaint and again in the proposed Second Amended Complaint in this case. Plaintiffs testified to this belief but offered no credible evidence that the City has discriminated against them. Plaintiffs at the evidentiary hearing sought to introduce evidence about campaign donations to the City's current mayor by some neighborhood homeowners and some of that information is in the record, but whether certain neighbors had better political connections with the City than did Plaintiffs is not evidence of the City discriminating against them due to their Ukrainian ancestry.

Plaintiffs' main argument of ethnic discrimination relates to the City's refusal to accept certain settlement offers from the Plaintiffs, most prominently one made after the Supreme Court affirmed summary judgment allowing razing of the home whereby Plaintiffs proposed to sell the home to Alexsey Gladush, a fellow Ukrainian who owns Califan Painting. With this being Plaintiffs' best evidence of discrimination against them as Ukrainians, the history of settlement discussion becomes relevant to put this evidence in context. Plaintiffs hired an attorney after entry of summary judgment to pursue an appeal to the Supreme Court of South Dakota. In February 2022, while the case was on appeal, Plaintiffs' attorney proposed to the City a settlement agreement to allow Plaintiffs to complete the home by certain deadlines. Doc. 19-1; Exh. 12. The City responded on March 1, 2022, that it had discussed the matter internally and it was "not in a position to allow Mr. Strizheus time to complete construction on the home given the multiple opportunities we have already afforded him and his continued failure to follow through." Doc. 19-2 at 1; Exh. 13. However, the City stated that it "would be willing to hold off demolition of

8

the structure in the event Mr. Strizheus wants to sell the property." Doc. 19-2 at 1; Exh. 13. Later during the pendency of the appeal, the City and counsel for Plaintiffs appeared to have an agreement in principle that Plaintiffs would list and sell the home through a realtor and the City presumably would then forego enforcement of the demolition order against a subsequent purchaser, but Plaintiffs declined to settle on those terms.

After the Supreme Court affirmed the grant of summary judgment, Plaintiffs again inquired about possible settlement, prompting an attorney for the City to contact a lawyer who was affiliated with the neighbors about how the neighbors felt about the home. The City attorney acknowledged that "the home is a solid structure that is not far from completion" and had passed its interior utility rough-in inspections. Doc. 19-3. The neighborhood lawyer summarized his understanding of the options to be: "1) allow the Strizheus' to complete the home, 2) require the home be demolished (in which case Strizheus has said he'll just rebuild), or [3)] attempt to push them to sell the home to a third party who can then complete the same." Id. The neighborhood attorney suspected that the neighbors' group would likely have a range of opinions on the subject. Doc. 19-3; Exh. 14.

Thereafter, Plaintiffs' attorney sent an executed Real Estate Purchase Agreement between Plaintiffs and Gladush, which was expressly contingent on the City foregoing the demolition order. Doc. 19-5; Exh. 7. Gladush testified that he had negotiated with Vitaliy for a purchase price of $1.2 million, down from the request Vitaliy had made for $1.8 million, and that he had no side deal to transfer the property back to Plaintiffs.[6] Gladush had plans to complete construction of the home, but not to live there; he had not sought out financing for the purchase or for the cost of completing construction. The City rejected the proposal on January 20, 2023, indicating an

---

[6] The Real Estate Purchase Agreement between Plaintiffs and Gladush no longer is in place. The City did not forego the demolition order, which was a contingency in the agreement, and the closing date of March 11, 2023, has now passed. Exh. 7.

intention to move forward with the demolition.  Doc. 19-6; Exh. 16.  Neither Gladush nor the Plaintiffs talked with the City as to why the offer was rejected.

The City had no duty or obligation to settle with Plaintiffs, and particularly after the Supreme Court decision, could proceed with demolition, at least without any obstacle in state or local law.  Even though some resolution short of demolition would be entirely rational here, the City is not compelled to resolve the case and can drive a hard bargain if it wishes to settle.  In short, there is nothing in the record to indicate that this settlement history reflects bias by the City against Plaintiffs as Ukrainians.  Indeed, the only other instance of demolition of a mansion in the City, in an entirely unrelated case involving very different facts, was one owned by a non-minority couple.  McDowell v. Sapienza, 906 N.W.2d 339 (S.D. 2018); see also Sapienza v. Liberty Mut. Fire Ins. Co., 389 F. Supp. 3d 648 (D.S.D. 2019).

On February 17, 2023, the City—not being exempt from its own permitting requirements— received a permit to allow razing of the home.  The City estimates that the cost to raze the home will be $85,000.  The land will remain with the Plaintiffs after the City razes the structure.

At the evidentiary hearing, Plaintiffs presented evidence that demolition of their partially completed home deeply saddens them and may have a traumatizing effect on their children.  See Exh. 4.  A record from Getty Abstract appeared to show that Plaintiffs have incurred $3,764,191.92 in construction costs, in addition to the expense of buying the lots, one of which Plaintiff sold to a neighbor and then reacquired at a premium upon learning that geothermal heating lines ran from the home beneath that lot.  Plaintiffs blame the Mayor for their chilly reception at city council meetings where they have tried to address this situation.

The City during cross-examination exposed that Plaintiffs bought a 3,700 square foot 5-bedroom home elsewhere in Sioux Falls in 2021 and that Plaintiffs owe some $600,000 to

10

$700,000 in past-due federal income taxes.  The City's questioning also left a lack of clarity about Plaintiffs' financial resources, although these matters are collateral to the issues now before this Court.

## II.    DISCUSSION AND ANALYSIS

### A. Preliminary Injunction Factors

Plaintiffs seek a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure.  "A district court considering injunctive relief evaluates [1] the movant's likelihood of success on the merits, [2] the threat of irreparable harm to the movant, [3] the balance of the equities between the parties, and [4] whether an injunction is in the public interest."  Powell v. Ryan, 855 F.3d 899, 902 (8th Cir. 2017) (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).  These four considerations are commonly known within the Eighth Circuit as the "Dataphase factors."  "No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue.  However, in deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant."  Turtle Island Foods, SPC v. Thompson, 992 F.3d 694, 699 (8th Cir. 2021) (cleaned up and citations omitted).  A preliminary injunction is an "extraordinary remedy," and the burden of establishing that such an injunction should enter rests with the moving party, here the Plaintiffs.  Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).

### B. Likelihood of Success on the Merits

#### 1. Plaintiffs' Claims

The first and most significant Dataphase factor considers "the movant's likelihood of success on the merits."  Dataphase Sys., 640 F.2d at 114.  Plaintiffs' initial Complaint contained two claims that appeared to have no possibility of success on the merits—Count II alleging under

11

42 U.S.C. § 1983 and the Fourteenth Amendment a claim for national origin discrimination against them as Ukrainians,[7] and Count III alleging a civil conspiracy by certain City officials to perpetrate that discrimination. This Court noted at the end of the preliminary injunction evidentiary hearing that Plaintiffs' belief that there was such discrimination did not make up for the dearth of evidence of any such discrimination. The facts as summarized above contain no direct or circumstantial evidence to support such a discrimination claim. After the hearing, Plaintiffs filed an Amended Complaint dropping Counts II and III, but on March 22, 2023, filed a motion to amend complaint and a proposed Second Amended Complaint, Docs. 36, 36-1, that seeks to add those claims back and name Mayor Paul TenHaken and various other unidentified city officials. At this point, Plaintiffs need leave of court to file another amended complaint, Fed.R.Civ.P. 15(a), which this Court will consider after the City has an opportunity to respond to the motion. The City has 21 days under the District of South Dakota's Civil Local Rules to respond to the motion. This Court is disinclined to grant injunctive relief based on claims that do not appear in the Amended

---

[7] This Court conducted the preliminary injunction hearing on the one-year anniversary of Russia's unprovoked and reprehensible invasion of Ukraine, which justifiably produced a groundswell of support for Ukrainians among those in western democracies, including in the United States. In the year since, American support for Ukraine has continued to be strong in most segments of society. However, warm feelings among Americans for Ukraine have not always been so strong. After all, the previous president had denied that Russia was in Ukraine even after Russia had publicly "annexed" from Ukraine and occupied the Crimean Peninsula and had some troops operating in other parts of eastern Ukraine; that prior president also tried to leverage Ukraine for dirt on a political rival in exchange for military support authorized by Congress. The United States has a rich history as a country descended from immigrants, with only approximately 2% of its population identifying as Native American. Notwithstanding the inviting words on the Statue of Liberty— "give me your tired, your poor, your huddled masses yearning to breathe free"—the United States undeniably has instances in its history of racial and ethnic discrimination and remains bitterly divided over immigration policies. Thus, it is not inconceivable that Plaintiffs have faced discrimination, but there is utterly no evidence that any such discrimination existed with the City or motivated the City or its officials at any time in their dealings with Plaintiffs.

Complaint, but based on the facts summarized above sees no facts suggesting that Plaintiffs are likely to succeed on a claim of ethnic discrimination against the City, its mayor, or its officials.

Plaintiffs' Amended Complaint contains a single cause of action, but there are three different federal claims contained within that count—an Eighth and Fourteenth Amendment claim for excessive fine; a Fifth and Fourteenth Amendment claim of a taking without just compensation; and a claim that the City ordinance at issue is unconstitutional. Doc. 30 at 4–5. The Amended Complaint also invokes Article VI of the Constitution of the State of South Dakota and Plaintiffs' proposed Second Amended Complaint echoes their supplemental brief in making an estoppel argument, though these are state law claims over which this Court at most would have supplemental jurisdiction. The City argues that none of Plaintiffs' claims are viable because they are barred under the <u>Rooker-Feldman</u> doctrine and res judicata principles.

### 2. **<u>Rooker-Feldman</u> Doctrine**

The <u>Rooker-Feldman</u> doctrine takes its name from two decisions of the Supreme Court of the United States. <u>Rooker v. Fidelity Tr. Co.</u>, 263 U.S. 413 (1923); <u>Dist. of Columbia Ct. of Appeals v. Feldman</u>, 460 U.S. 462 (1983). The <u>Rooker-Feldman</u> doctrine holds that "'only the United States Supreme Court has been given jurisdiction to review a state-court decision,' so federal district courts generally lack subject-matter jurisdiction over 'attempted appeals from a state court judgment.'" <u>Friends of Lake View Sch. Dist. 25 v. Beebe</u>, 578 F.3d 753, 758 (8th Cir. 2009) (quoting 18B Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 4469 (2d ed. 2002)) "The <u>Rooker-Feldman</u> doctrine . . . is confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280, 284 (2005). The <u>Rooker-Feldman</u>

13

doctrine justifies dismissal of the federal suit if four conditions are met: "(1) the federal court plaintiff must have lost in state court, (2) the plaintiff must complain of injuries caused by a state court judgment, (3) the plaintiff must invite district court review and rejection of that judgment, and (4) the state court judgment must have been rendered before the district court proceedings commenced." Christ's Household of Faith v. Ramsey Cnty., 618 F. Supp. 2d 1040, 1044 (D. Minn. 2009); see Exxon Mobil, 544 U.S. at 284.

Here the elements of the Rooker-Feldman doctrine apply to Plaintiffs' case at least to the extent that this Court is prohibited from questioning the accuracy or wisdom of the state court decision. All four elements of the Rooker-Feldman doctrine apply to any effort to avoid the state court decision: 1) Plaintiffs were the loser in the state court proceeding; 2) Plaintiffs are in fact complaining of an injury caused by the state court judgment—authorization of demolition under City ordinance; 3) Plaintiffs at least to some extent are inviting this Court to review and reject that decision authorizing demolition under City ordinance; and 4) the state court judgment was entered before this case started. This Court thus can only consider claims that are not foreclosed under the Rooker-Feldman doctrine, namely those claims that do not invite this Court to review and reject the state court decisions.

The Eighth Circuit has noted that the Rooker-Feldman doctrine forecloses "not only straightforward appeals but also more indirect attempts by federal plaintiffs to undermine state court decisions," such as "general constitutional claims that are 'inextricably intertwined' with specific claims already adjudicated in state court." Lemonds v. St. Louis Cnty., 222 F.3d 488, 492–93 (8th Cir. 2000) (quoting Feldman, 460 U.S. at 482 n.12). The state and federal constitutional claims are "inextricably intertwined" if the federal claim succeeds only upon a determination that the state court wrongly decided the issue before it. Id. at 493. Here the

excessive fine claim under the Eighth and Fourteenth Amendments and takings claim under the Fifth and Fourteenth Amendments appear to survive the <u>Rooker-Feldman</u> doctrine so long as they do not depend on an assumption or conclusion that the state court wrongly decided any matter before it. While the <u>Rooker-Feldman</u> doctrine may bar the Plaintiffs' claims of unconstitutionality of the City ordinance or estoppel for issuing building permits, there is a more obvious reason—res judicata—why the Plaintiffs cannot succeed on those particular claims.

### 3. Res Judicata

The City next argues that the principle of res judicata bars all of Plaintiffs' claims. The concept of res judicata includes both claim preclusion and issue preclusion. <u>Taylor v. Sturgell</u>, 553 U.S. 880, 892 (2008); <u>see also</u> <u>Am. Fam. Ins. Grp. v. Robnik</u>, 787 N.W.2d 768, 774 (S.D. 2010). Claim preclusion "forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit[,]'" while "[i]ssue preclusion, in contrast, bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." <u>Taylor</u>, 553 U.S. at 892 (quoting <u>New Hampshire v. Maine</u>, 532 U.S. 742, 748–49 (2001)). As the Supreme Court of the United States has stated: "[b]y 'precluding parties from contesting matters that they have had a full and fair opportunity to litigate,' these two doctrines protect against 'the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions.'" <u>Id.</u> (cleaned up) (quoting <u>Montana v. United States</u>, 440 U.S. 147, 153–54 (1979)).

"[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." <u>Migra v. Warren City Sch. Dist. Bd. of Educ.</u>, 465 U.S. 75, 81 (1984). Therefore, this Court looks to South

Dakota law to define the preclusive effect of the prior final judgment the City received against Plaintiffs.  See Hanig v. City of Winner, 527 F.3d 674, 676 (8th Cir. 2008) (stating that federal courts "must give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so . . . [T]he issue we must decide turns on the South Dakota law of issue and claim preclusion." (cleaned up and citations omitted)).

While South Dakota law recognizes the difference between claim and issue preclusion, see Merchs. State Bank v. Light, 458 N.W.2d 792, 793–94 (S.D. 1990), it has applied the same four elements in both claim and issue preclusion cases:

> (1) the issue in the prior adjudication must be identical to the present issue, (2) there must have been a final judgment on the merits in the previous case, (3) the parties in the two actions must be the same or in privity, and (4) there must have been a full and fair opportunity to litigate the issues in the prior adjudication.

Dakota, Minn. & E. R.R. Corp. v. Acuity, 720 N.W.2d 655, 661 (S.D. 2006).  When applying the elements of res judicata, the Supreme Court of South Dakota has stated, "a court should construe the doctrine liberally, unrestricted by technicalities.  However, because the doctrine bars any subsequent litigation, it should not be used to defeat the ends of justice."  People ex rel. L.S., 721 N.W.2d 83, 90 (S.D. 2006).

"Res judicata applies only if the second action is brought on the same 'cause of action' as the first."  Hicks v. O'Meara, 31 F.3d 744, 746 (8th Cir. 1994) (citation omitted).  "A cause of action is comprised of the facts which give rise to, or establish, the right a party seeks to enforce."  Merchs. State Bank, 458 N.W.2d at 794.  South Dakota has often stated that the test to determine whether a cause of action is the same is "whether the wrong sought to be redressed is the same in both actions."  Hicks, 31 F.3d at 746; Nelson v. Hawkeye Sec. Ins. Co., 369 N.W.2d 379, 381 (S.D. 1985); Hanig, 527 F.3d at 676.  "To make this determination, South Dakota law requires we look to the underlying facts which give rise to each cause of action."  Hicks, 31 F.3d at 746; see

Frigaard v. Seffens, 599 N.W.2d 646, 648–49 (S.D. 1999) (applying the four-element test and stating "[t]he *same transaction* is again at issue involving precisely the same subject matter and parties" (emphasis added)); Bank of Hoven v. Rausch, 449 N.W.2d 263, 266–67 (S.D. 1989) (holding res judicata applied since the second claim "*arose out of the transaction or occurrence that was the subject matter of the [other party's] claim*" (emphasis added)).  The Eighth Circuit has noted that South Dakota res judicata law uses language and analysis consistent with the "nucleus of operative fact" approach.  Ruple v. City of Vermillion, S.D., 714 F.2d 860, 861–62 (8th Cir. 1983) ("More recently, the phrase 'cause of action,' or 'claim,' the term now favored by most courts, has been given a more practical construction.  It is now said, in general, that if a case arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action, that the two cases are really the same 'claim' or 'cause of action' for purposes of res judicata . . . .  Here, the effect of the prior judgment is governed by the law of South Dakota . . . .  The Supreme Court of South Dakota has recently made clear that it adheres to the practical definition of 'cause of action' just discussed . . . .").

Plaintiffs' federal claims arise out of the same nucleus of facts where "the wrong sought to be redressed is the same" as in the prior state court case.  Hicks, 31 F.3d at 746.  Both the state litigation and this case centers on the City's decision to enforce an ordinance which allows for demolition as a remedy against Plaintiffs for a lapse in normal construction activity of their mansion.  Thus, the first element of res judicata is met.

The second element of res judicata under South Dakota law is met because the prior litigation resulted in a final judgment, indeed a final judgment affirmed by the Supreme Court of South Dakota.  The Supreme Court of South Dakota has stated that "a judgment on the merits is one which is based on legal rights rather than matters of procedure and jurisdiction." Nelson, 369

N.W.2d at 381. Such a judgment exists here. Likewise, the third element of res judicata—the two parties are the same or in privity—is unquestionably met.

The fourth and final element for res judicata under South Dakota law is that the party had a full and fair opportunity to litigate the issues in the prior adjudication. The Supreme Court of South Dakota has stated that "claim preclusion not only precludes relitigation of issues previously heard and resolved; it also bars prosecution of claims that could have been raised in the earlier proceeding, even though not actually raised." Am. Fam. Ins. Grp., 787 N.W.2d at 775 (cleaned up and citation omitted). As the Supreme Court of South Dakota has stated, "whether [a party] had a full and fair opportunity to litigate is not determined by whether it is still possible to find additional evidence concerning that claim. As other courts have held, newly-discovered evidence does not provide an exception to res judicata." Est. of Johnson ex rel. Johnson v. Weber, 898 N.W.2d 718, 733 (S.D. 2017) (cleaned up and citations omitted) (collecting and listing cases). "When a party to litigation fails to develop all of the issues and evidence available in a case, the party is not justified in later trying the omitted issues or facts in a second action based on the same claim." Am. Fam. Ins. Grp., 787 N.W.2d at 775 (citation omitted).

Plaintiffs had an opportunity in state court to present their claims that the ordinance at issue is unconstitutional, whether on its face or as applied. The fact that they did not present that claim in the state proceeding does not mean that they lacked a full and fair opportunity to do so. The City was seeking to enforce the ordinance to require demolition, the Plaintiffs were opposing demolition under the ordinance, nothing prevented the Plaintiffs from arguing that the ordinance was unconstitutional on its face or as applied to their partially-constructed mansion, and the argument about unconstitutionality of the ordinance does not arise out of Plaintiffs' decision to spend substantially more money to advance construction of the home during the pendency of the

appeal or what has occurred after the South Dakota Supreme Court affirmed the trial court ruling. Likewise, the estoppel argument that Plaintiffs make concerning the City continuing to issue permits to advance construction of the home (which occurred prior to the final judgment of the state trial court) could have been raised as a defense at the trial court level. The argument of estoppel by approving work of Harvey Custom Homes during the pendency of the appeal, however, could not have been raised before the state trial court because that occurred after the trial court's final judgment entered.

The two federal causes of action here allege a taking without just compensation under the Fifth and Fourteenth Amendments and a constitutionally excessive fine under the Eighth and Fourteenth Amendments. Whether Plaintiffs could and should have raised those claims during the state litigation depend heavily on when such claims accrued and became ripe.

### 4. Ripeness, Accrual, and Viability of Federal Claims

A federal court lacks jurisdiction over claims that have not yet accrued or are not yet ripe. As one of the justiciability doctrines, ripeness concerns whether a claim is being brought at the proper time. See Vogel v. Foth & Van Dyke Assocs., 266 F.3d 838, 840 (8th Cir. 2001). The doctrine of ripeness prevents a Court from issuing an advisory opinion on a hypothetical state of facts. KCCP Tr. V. City of N. Kansas City, 432 F.3d 897, 899 (8th Cir. 2005). Thus, claims are not ripe when they rest on "contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (cleaned up and citations omitted); see also 281 Care Comm. v. Arneson, 638 F.3d 621, 631 (8th Cir. 2011); Pub. Water Supply Dist. No. 8 of Clay Cnty. v. City of Kearney, 401 F.3d 930, 932 (8th Cir. 2005). "Ripeness requires a court to evaluate 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" KCCP Tr., 432 at 899 (quoting Texas, 523 U.S.

19

at 300–01).  The Supreme Court has found that "a possible financial loss is not by itself a sufficient interest to sustain a judicial challenge to governmental action."  Abbot Lab'ys v. Gardner, 387 U.S. 136, 153 (1967) (abrogated on other grounds).  Although pre-enforcement judicial action may be appropriate to block some governmental action, see id. at 154; Texas, 523 U.S. at 301–02, a claim typically is not ripe until actual financial loss from government action occurs, Abbot Lab'ys, 387 U.S. at 153.

A related question to ripeness is when a claim accrues.  See Wallace v. Kato, 549 U.S. 384, 388 (2007) (stating that one of the aspects of claim accrual is when an injury occurred).  A claim accrues "when the plaintiff has a complete and present cause of action."  Rassier v. Sanner, 996 F.3d 832, 836 (8th Cir. 2021) (cleaned up and citations omitted).

> In a federal question case, and in the absence of a contrary directive from Congress, the "discovery rule," according to which a plaintiff's cause of action accrues when he discovers, or with due diligence should have discovered, the injury that is the basis of the litigation, is used to determine when a plaintiff's federal claim accrues.

Union Pac. R.R. Co. v. Beckham, 138 F.3d 325, 330 (8th Cir. 1998); Alcorn v. Burlington N. R.R., 878 F.2d 1105, 1108 (8th Cir. 1989) (stating that a cause of action accrues "when a claimant knows, or should know through an exercise of reasonable diligence, of the acts constituting the alleged violation"); see also Johnson v. Precythe, 901 F.3d 973, 980 (8th Cir. 2018), certiorari granted and judgment vacated on other grounds by Precythe v. Johnson, 139 S. Ct. 1546 (2019).  The question of when a federal cause of action accrues is based on federal law.  See McDonough v. Smith, 204 S. Ct. 2149, 2155 (2019) ("Although courts look to state law for the length of the limitations period, the time at which a § 1983 claim accrues "is a question of federal law[.]" (cleaned up and citation omitted)); Rassier, 996 F.3d at 836 ("When a section 1983 claim accrues is question of federal law."  (cleaned up and citation omitted)); see also Abdel v. U.S. Bancorp, 457 F.3d 877, 880 (8th Cir. 2006) ("The question of claim accrual, however, is governed by federal

common law."); <u>Motley v. United States</u>, 295 F.3d 820, 822 (8th Cir. 2002) ("When a claim accrues under [a federal law] is a question of federal law.").  Whether Plaintiffs' federal claims currently are ripe and when they accrued depend on the elements of the constitutional claims.

Plaintiffs' excessive fines claim has its roots in the Eighth Amendment, which provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."  U.S. Const. amend. VIII, § 1.  The Eighth Amendment applies to states, and in turn cities, under the Fourteenth Amendment.  <u>Timbs v. Indiana</u>, 139 S. Ct. 682, 686–87 (2019) ("The Excessive Fines Clause is therefore incorporated by the Due Process Clause of the Fourteenth Amendment."); <u>see also</u> <u>id.</u> at 691 ("[R]egardless of whether application of the Excessive Fines Clause to civil <i>in rem</i> forfeitures is itself fundamental or deeply rooted, our conclusion that the Clause is incorporated remains unchanged.").

"[A]t the time of the drafting and ratification of the [Eighth] Amendment, the word 'fine' was understood to mean a payment to a sovereign as a punishment for some offense." <u>Browning-Ferris Indus. of Vt, Inc. v. Kelco Disposal</u>, 492 U.S. 257, 265 (1989).  The Supreme Court in <u>Austin v. United States</u> stated that the "Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as <i>punishment</i> for some offense." 509 U.S. 602, 609–10 (1993) (cleaned up and citation omitted).  The Supreme Court in <u>Austin</u> explained that civil sanctions can constitute punishment, and therefore are subject to the limitations of the Excessive Fines Clause, if they serve, at least in part, retributive or deterrent purposes. <u>Id.</u> at 610; <u>see also</u> <u>id.</u> ("[A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment." (citation omitted)).  The Court in <u>Austin</u> ultimately concluded that civil <i>in rem</i> forfeitures fall within the Clause's protection when they are at least partially punitive. <u>Id.</u> at 618.

Defendants cite <u>John Corp. v. City of Houston</u>, 214 F.3d 573 (5th 2000), where the Fifth Circuit held that a city's demolition of some apartment buildings did not constitute "punishment" under the Eighth Amendment. <u>Id.</u> at 580. John Corp, as the plaintiff, relied on the Supreme Court's decision in <u>Austin v. United States</u>, but the United States Court of Appeals for the Fifth Circuit found that argument unconvincing:

> <u>Austin</u>, however, did not overrule <u>Ingraham v. Wright</u>, 430 U.S. 651 (1977). In <u>Ingraham</u>, the Court explicitly described the Eighth Amendment as being "designed to protect those convicted of crimes." 430 U.S. at 664; <u>see also id.</u> at 666 ("[T]he original Constitution was criticized in the Massachusetts and Virginia Conventions for its failure to provide any protection for persons convicted of crimes. This criticism provided the impetus for inclusion of the Eighth Amendment in the Bill of Rights."). It was this view of the Amendment's historical context that supported the Court's holding that the Amendment was not applicable to a case involving corporal punishment administered to schoolchildren. <u>See id.</u> at 669. There was no question regarding whether the paddling at issue in <u>Ingraham</u> was punishment. Thus, for <u>Austin</u>'s focus on punishment to provide the basis for Appellants' claims, <u>Ingraham</u> would have to have been overruled. It was not, and this dooms Appellants' claim.

<u>Id.</u> (footnote omitted). However, other courts of appeals have applied the excessive fines clause to civil money penalties. <u>See Yates v. Pinellas Hematology & Oncology, P.A.</u>, 21 F.4th 1288, 1308 (11th Cir. 2021); <u>F.P. Dev., LLC v. Charter Twp. of Canton, Mich.</u>, 16 F.4th 198, 209 (6th Cir. 2021).

Plaintiffs rely on <u>Alcorn v. Muhammand</u>, 66 N.Y.S.3d 819 (N.Y. Sup. Ct. 2017). In that case, the city closed an apartment building and evicted its residents for a year after finding that the building was a nuisance because of ongoing drug activity. <u>Id.</u> at 826. The New York Supreme Court found that the city's attempt to abate the drug activity was a punishment or fine:

> Inexplicably, plaintiffs are being deprived of income and their homes and potentially will sustain other losses when they have no control over the public nuisance sought to be eradicated. The closure is, in essence, a punishment or fine that is without regard for the lack of participation by plaintiffs in the public nuisance and wholly disproportionate to the evil sought to be eradicated.

Id. at 832.

Thus, the parties debate whether demolition of Plaintiffs' home would constitute an excessive fine within the meaning of the Eighth Amendment. The parties also disagree over when any excessive fine claim accrued. The City argues that Plaintiffs had a ripe claim of an excessive fine upon the initial orders to demolish the partially constructed home and certainly by the time of the state court litigation. Plaintiffs counter that their excessive fine claim did not become ripe until after the City obtained the demolition permit following the South Dakota Supreme Court's decision affirming summary judgment for the City. Ripeness and accrual of the excessive fine claim is a tricky question in this case that turns on applying the elements of the claim to these facts.

Courts typically consider there to be two elements to an Eighth Amendment Excessive Fines Claim: (1) did the government extract payment for the purpose of punishment, even in part, and (2) was the extraction excessive? Wright v. Riveland, 219 F.3d 905, 915 (9th Cir. 2000). The accrual or ripeness question then becomes when did the City act to extract payment for the purpose of punishment, see Austin, 509 U.S. at 609–10, which is a question neither party briefed. If the excessive fine claim is ripe only upon demolition—which would seem to be extraction of a payment, whether in cash or kind, as punishment of violation of the ordinance—then Plaintiffs' excessive fines claim has not yet accrued and cannot be a basis for entry of a preliminary injunction. The other point in time when an excessive fine claim arguably accrued would be when a demolition order became final, not when it was initially issued as the City provides notice of the right to appeal and indeed Plaintiffs availed themselves of that right. However, this Court disagrees with Plaintiffs' argument that the excessive fine claim accrued upon the City obtaining a permit for the demolition. When this claim accrued should be a focus of the briefing on the pending motion to dismiss, but preliminarily this Court concludes that the fine accrues either when

23

the demolition order was affirmed by the South Dakota Supreme Court or when demolition of the mansion occurs.  Regardless of which of these two points of accrual is proper, the Eighth and Fourteenth Amendment claim for excessive fine accrued after the state-court litigation and is not subject to dismissal under the <u>Rooker-Feldman</u> doctrine or res judicata principles.

The second element of an excessive fine case is that the extracted fine is in fact excessive. The Supreme Court has adopted a "gross proportionality" test to determine whether a fine is excessive for purposes of the Excessive Fines Clause.  <u>See</u> <u>United States v. Bajakajian</u>, 524 U.S. 321, 323 (1998); <u>see also</u> <u>Drakeford v. Tuomey</u>, 792 F.3d 364, 387 (4th Cir. 2015) (explaining that a civil fine will be found "constitutionally excessive only if it is grossly disproportional to the gravity of the offense." (cleaned up and citation omitted)).  The Court explained that "[t]he amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish" and held that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportionate to the gravity of the defendant's offense." <u>Bajakajian</u>, 524 U.S. 334.  The Eighth Circuit has provided additional guidance on excessive fine proportionality considerations, stating that the Eighth Amendment "demands that a constitutionally cognizable disproportionality reach such a level of excessiveness that in justice the punishment is more criminal than the crime," and a non-exhaustive list of factors to consider include

> the extent and duration of the criminal conduct, the gravity of the offense weighed against the severity of the criminal sanction, . . . the value of the property forfeited . . . an assessment of the personal benefit reaped by the [fined party], the [fined party's] motive and culpability, and, of course, the extent that the [fined party's] interest and the enterprise itself are tainted by criminal conduct

<u>United States v. Bieri</u>, 68 F.3d 232, 236 (8th Cir. 1995) (citations omitted).

Evaluating likelihood of success on the excessive fines claim at this stage of the litigation is difficult.  Quite possibly, because there appears to be no extracted fine at this point, the claim

does not accrue until demolition, at which point Plaintiffs appear to have a viable excessive fines claim. If the excessive fines claim does not accrue until demolition, then it cannot support a preliminary injunction and Plaintiffs' only remedy for such a claim is monetary and not injunctive.

Plaintiffs' remaining federal claim is under the Fifth and Fourteenth Amendments for a taking. The Fifth Amendment Takings Clause prohibits the government from taking "private property . . . for public use, without just compensation." U.S. Const. amend. V. "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without compensation." Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194 (1985), overruled on other grounds by Knick v. Twp. of Scott, Pa., 139 S. Ct. 2162 (2019). A takings claim arises when the government takes private property for public use without compensation. Knick, 139 S. Ct. at 2170.

The Supreme Court in Knick explained that the appropriate remedy for a government taking is compensation. Id. at 2175–77. Equitable relief is unavailable because "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." Id. at 2176. The Court held that "[a]s long as just compensation remedies are available—as they have been for nearly 150 years—injunctive relief will be foreclosed." Id. at 2179. Thus, Plaintiffs' takings claim does not accrue until the mansion is in fact taken by the City through demolition and does not provide a basis for injunctive relief. Because the claim had not accrued at the time of the state court litigation, neither the Rooker-Feldman doctrine nor principles of res judicata bar the claim.

Plaintiffs also have made an estoppel argument, though their Amended Complaint does not allege an estoppel claim.[8]  Doc. 30.  The concept of estoppel centers on "principles of morality and fair dealing and is intended to subserve the ends of justice."  City of Rapid City v. Hoogterp, 179 N.W.2d 15, 16 (S.D. 1970); City of Rapid City v. Big Sky, LLC, 914 N.W.2d 541, 547 (S.D. 2018) (cleaned up and citation omitted).  Under South Dakota law the application of equitable estoppel against public entities, such as the City, is generally disfavored and only applies in "extreme cases" or under "exceptional circumstances."  Even v. City of Parker, 597 N.W.2d 670, 674 (S.D. 1999); Yankton Cnty. v. McAllister, 997 N.W.2d 327, 340 (S.D. 2022).  The party seeking to rely on estoppel has the burden of proving that such exceptional circumstances exist.  McLaen v. White Twp., 974 N.W.2d 714, 726 (S.D. 2022).  Thus, application of equitable estoppel is fact-specific, Evans, 597 N.W.2d at 674, and "more than municipal acquiescence [is] required," McLaen, 974 N.W.2d at 726 (cleaned up).  Instead, "a municipal officer must have taken some affirmative action influencing another which renders it inequitable for the municipality to assert a different set of facts."  Id. (cleaned up and citation omitted).  The affirmative conduct of the municipal officer "must have induced the other party to alter his position or do that which he would not otherwise have done to his prejudice."  Smith v. Neville, 539 N.W.2d 679, 682 (S.D. 1995).

Plaintiffs' estoppel claim about building permit issuance to Harvey Custom Homes prior to the summary judgment hearing should have been raised during the state litigation and is barred by res judicata.  Plaintiffs' argument about building inspections during the pendency of the appeal though could not have been raised to the state trial court and thus is not barred by the Rooker-Feldman doctrine or res judicata.  It is mystifying both why Plaintiffs would continue construction

---

[8] Plaintiffs' proposed Second Amended Complaint seeks to state an equitable estoppel claim in Count IV, but for the reasons described above, leave of court is required for Plaintiffs to serve and file another amended complaint and has not been granted.

when summary judgment had been entered requiring demolition of the home and why the City after obtaining such a demolition order would conduct inspections and approve the ongoing work. However, the fact that the City approved the quality of the work does not negate the trial court's entry of summary judgment nor the South Dakota Supreme Court's affirmance thereof. Indeed, counsel for Plaintiffs understood as much in attempting to negotiate with the City during the pendency of the appeal for some arrangement where the City might forego demolition. Thus, Plaintiffs lack the detrimental reliance on the City's conduct of doing inspections during the pendency of the appeal, to justify applying estoppel principles to avoid enforcement of the state court decisions.

This analysis leads to the conclusion that Plaintiffs have little chance of prevailing on any ripe claim, unless the excessive fines claim is ripe, and that Plaintiffs' viable federal claims are ones for money damages that accrue only upon the actual demolition of the partially constructed mansion. Claims that have not yet accrued do not support injunctive relief. Likelihood of success on the merits is the primary factor that a party seeking a preliminary injunction must show, and Plaintiffs have not met that burden.

### C. Remaining **Dataphase** Factors

The remaining Dataphase factors do not tip the balance toward Plaintiffs. On the second Dataphase factor, Plaintiffs face the threat of a great harm—demolition of their dream home that has the exterior essentially completed and is partially completed on the inside, which a realtor believes is worth $2.75 million. However, the second factor focuses on the threat of *irreparable* harm. An irreparable harm is one that cannot be compensated through money. Gen. Motors Corp. v. Harry Brown's LLC, 563 F.3d 312, 319 (8th Cir. 2009) ("Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through

an award of damages."). If the Plaintiffs were to succeed on their claims for excessive fine and a taking without just compensation, the City has the money to compensate them so the harm is not irreparable.

The balance of the harms slightly favors the Plaintiffs. The City has a strong interest in having contractors and others take the permit process seriously and to avoid situations where partially completed homes sit empty as an eyesore[9] for years as neighborhoods develop around them. The City also has an interest in enforcing judgments it receives and deterring Plaintiffs and others from not taking seriously permits, ordinances, and orders based thereon. But the harm to the Plaintiffs—while admittedly substantially self-inflicted by letting construction lapse for years, not having legal counsel at important times, foregoing an opportunity to resolve the case during appeal, and investing two million dollars more after losing at the trial court level—is obvious in demolition of a home well into construction that currently is valued at $2.75 million.

The public interest element is mixed. The public has a strong interest in having building codes and regulations function properly to allow development of Sioux Falls in a rational and aesthetically pleasing manner. Destruction of the home as it existed at the time of the initial orders for demolition likely would have served the interests of the surrounding community and in turn public interest. However, now that the home has a completed exterior and partially completed interior, razing of the home does not appear to benefit the public or the neighborhood, as it would lead to the public spectacle of demolition of a mansion that no longer appears from the outside to be an eyesore, followed by empty lots on which new construction might or might not then resume

---

[9] The home appears to have been an eyesore for many years while partially completed, but no longer appears that way.

at some point in the future.  And as the Court remarked at the preliminary injunction hearing, razing of the home would seem to be an incredible waste at this point.

## III.   CONCLUSION AND ORDER

This Court must follow precedent and does not have the authority to impose on the parties a more rational result than razing of the home followed by likely more litigation.  For the reasons explained at length above, it is

ORDERED that Plaintiffs' motion for preliminary injunction, Doc. 3, is denied.

DATED this __27ᵗʰ__ day of March, 2023.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

29